**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| BANCO SAFRA S.A. – CAYMAN ISLANDS BRANCH, Individually and on Behalf of All Others Similarly Situated, | : : : : : : | **Civil Action No.:** |
| Plaintiff, | : : : : | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | : : : : | |
| SAMARCO MINERAÇÃO S.A. and RICARDO VESCOVI DE ARAGÃO, | : : : : | **JURY TRIAL DEMANDED** |
| Defendants. | : : : : : : : | |

Plaintiff Banco Safra S.A. – Cayman Islands Branch ("Plaintiff"), individually and on behalf of all other persons similarly situated, by its undersigned attorneys, for its complaint against Defendants, alleges the following based upon personal knowledge as to itself and its own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through its attorneys, which included, among other things, a review of the offering memoranda published by Samarco Mineração S.A. ("Samarco" or the "Company") in connection with the Company's note offerings, as well as media and analyst reports about the Company.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of all purchasers of Samarco's 10-year notes respectively due 2022, 2023, and 2024 between October 31, 2012 and November 30, 2015, both dates inclusive (the "Class Period"), seeking to recover compensable damages caused by Defendants' violations of the Exchange Act of 1934 (the "Exchange Act").

2.      Samarco is a privately held Brazilian mining company, controlled in equal parts by the Brazilian mining company Vale S.A. ("Vale") and the Australian mining company BHP Billiton Limited ("BHP").  The Company's main product is iron ore pellets, made from minerals with low ore content and sold to steel makers worldwide

3.      Between 2012 and 2014, Samarco conducted at least three debt offerings.  In 2012, the Company offered an aggregate principal amount of $1 billion of 4.125% notes due 2022 (the "2022 Notes").  In 2013, the Company offered an aggregate principal amount of $700 million of 5.75% notes due 2023 (the "2023 Notes").   In 2014, the Company offered an aggregate principal amount of $500 million of 5.375% notes due 2024 (the "2024 Notes").

4.      Extraction and beneficiation of iron ore are conducted at Samarco's Germano facilities, located in the municipality of Mariana.  Conveyor systems are used to extract ore and transport it from the mines.  Ore beneficiation then occurs in concentrators, where crushing, milling, desliming and flotation processes produce iron concentrate.  Concentrate leaves the concentrators as slurry and is pumped through pipelines to pellet plants in Anchieta, where it is processed into pellets.  The iron ore pellets are then heat treated and stored in a stockpile yard before being shipped out of a Samarco-owned port in Anchieta.

5.      The waste materials resulting from extracting and processing iron ore from slurry are known as tailings and are transferred to large reservoirs, or tailings ponds, where they are

kept. Iron ore mining produces an enormous amount of waste that requires containment in these ponds, which are secured by dams.  Tailings dams are typically constructed in stages, with embankments raised as mine and waste output increases.  Because tailings may contain harmful elements used in mining and processing ore, it is exceedingly important to ensure that the tailings remain contained and do not contaminate the surrounding area and populace.

6.      In the three years before the collapse of the Fundão tailings dam, the price of iron ore fell sharply, thereby increasing pressure on Samarco and other mining companies to cut costs while increasing production.  In 2013, Samarco approved a plan to increase the Company's iron ore production capacity by approximately 37% through the implementation of and completion of a $3.2 billion project (the "P4P Project") in Minas Gerais.  As production of iron ore at Samarco's Germano complex increased, the Company's Fundão tailings dam was chosen to accommodate the growth in tailings associated with the P4P Project.  The volume of tailings stored in the Fundão dam subsequently increased significantly.  To accommodate the additional waste volume, Samarco's Board of Directors approved a project to elevate the Fundão dam in 2015.

7.      Throughout the Class Period, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company's Fundão tailings dam had longstanding systemic and structural defects; (ii) despite representing to investors that Samarco had mitigated the risk of a catastrophic accident as much as possible through "a combination of risk management, careful evaluation, experience and knowledge," Samarco had in fact ignored repeated, reliable warnings regarding the condition of the Fundão tailings dam; and (iii) as a result of the foregoing, Defendants' statements about Samarco's business, operations, and prospects were false and misleading and/or lacked a reasonable basis.

8.     On November 5, 2015, Samarco's Fundão tailings dam burst, causing the downstream Santarem water dam to overflow, flooding 60 million cubic meters of land, decimating the indigenous village of Bento Rodrigues, and contaminating the Rio Doce River and the water supply for 200 towns with arsenic, lead, chromium and various other heavy metals.

9.     Subsequent investigations revealed that Samarco had for years disregarded safety concerns raised with respect to the Fundão dam, refusing to implement an emergency management plan, disregarding warnings of design deficiencies and the consequences of expanding the dam, and ignoring recommendations to install pressure sensors and monitor the dam even after cracks appeared in it.  Instead, Samarco ramped up production at its Germano facilities to offset falling ore prices, thereby increasing the waste volume to be contained by the Fundão tailings dam, despite its known deficiencies, and chose to implement only a "patchwork solution" to accommodate the additional waste volume.

10.     Immediately after the Fundão dam disaster, the government of the state of Minas Gerais suspended Samarco's activities.  Brazilian prosecutors have accused Samarco of deliberate misconduct, charged 21 of its executives with qualified homicide in connection with the dam's failure, and are seeking billions of dollars in compensatory and environmental recovery fees from the Company.  Samarco has not resumed its mining operations since the collapse.

11.     The offering memoranda issued in connection with Samarco's offerings of the Notes and the annual management reports issued by Samarco during the Class Period misrepresented material facts concerning the Company's programs and procedures to mitigate environmental, health and safety concerns associated with its tailings dams.  When the truth about the Company's operations was revealed by the collapse of the Fundão dam and

investigation into its causes, the value of Samarco's Notes significantly declined, harming investors.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

14.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) because Plaintiff purchased Samarco's Notes from broker-dealers and/or counterparties within this Judicial District.

15.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

16.     Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Samarco's Notes pursuant to domestic transactions, including but not limited to, the use of U.S. broker/dealers, as well as from counterparties located in the United States during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

17.     Defendant Samarco is a privately held Brazilian mining company, controlled in equal parts by Vale and BHP Billiton.  Samarco was at all relevant times the owner of the

Fundão tailings dam, the catastrophic failure of which in November 2015 caused, *inter alia*, the destruction of the indigenous town of Bento Rodrigues in Brazil and significant environmental damage .

18.     Defendant Ricardo Vescovi de Aragão ("Vescovi") served at all relevant times as Samarco's Chief Executive Officer ("CEO").

## SUBSTANTIVE ALLEGATIONS

### Background

19.     Samarco is a privately held Brazilian mining company, controlled in equal parts by Vale and BHP.  The Company's main product is iron ore pellets, made from minerals with low ore content and sold to steel makers worldwide.

20.     Extraction and beneficiation of iron ore are conducted at Samarco's Germano facilities, located in the municipality of Mariana.  Conveyor systems are used to extract ore and transport it from the mines.  Ore beneficiation then occurs in concentrators, where crushing, milling, desliming and flotation processes produce iron concentrate.  Concentrate leaves the concentrators as slurry and is pumped through pipelines to pellet plants in Anchieta, where it is processed into pellets.  The iron ore pellets are then heat treated and stored in a stockpile yard before being shipped out of a Samarco-owned port in Anchieta.

21.     The waste materials resulting from extracting and processing iron ore from slurry are known as tailings and are transferred to large reservoirs, or tailings ponds, where they are kept. Iron ore mining produces an enormous amount of waste that requires containment in these ponds, which are secured by dams.  Tailings dams are typically constructed in stages, with embankments raised as mine and waste output increases.  Because tailings may contain harmful

elements used in mining and processing ore, it is exceedingly important to ensure that the tailings remain contained and do not contaminate the surrounding area and populace.

22.     In the three years before the collapse of the Fundão tailings dam, the price of iron ore fell sharply, thereby increasing pressure on Samarco and other mining companies to cut costs while increasing production.  In 2013, Samarco's Board of Directors approved a plan to increase the Company's iron ore production capacity by approximately 37% through the implementation of and completion of the $3.2 billion P4P Project in Minas Gerais.  As production of iron ore at Samarco's Germano complex increased, the Company's Fundão tailings dam was chosen to accommodate the growth in tailings associated with the P4P Project.  The volume of tailings stored in the Fundão dam subsequently increased significantly.  To accommodate the additional waste volume, Samarco's Board of Directors approved a project to elevate the Fundão dam in 2015.

**Materially False and Misleading
Statements Issued During the Class Period**

23.     The Class Period begins on October 31, 2012, when Samarco published an Offering Memorandum in connection with its offering of 4.125% notes due 2022 in an aggregate principal amount of $1 billion (the "2022 Offering Memorandum").

24.     In the 2022 Offering Memorandum, regarding the Company's tailings dams, Samarco assured investors that:

> Samarco has an in-house engineering team with responsibility for design, construction and monitoring of the tailings disposal facilities. This team is supported by geotechnical consultants for stability analysis and design work. An independent technical review board formed by Brazil based professionals provides oversight of the tailings operations on a regular basis. An international tailings consultant completes an annual review of the tailings operations as well.

7

25.      In the 2022 Offering Memorandum, with respect to safety risks in its operations,

Samarco merely advised investors that:

> The exploration for, exploitation and development of, mineral deposits involves
> significant risks that even a combination of risk management, careful evaluation,
> experience and knowledge cannot eliminate. Our exploration, extraction and
> production activities may be hampered by industrial accidents, equipment failure,
> unusual or unexpected geological and geotechnical conditions, environmental
> hazards, labor disputes, changes in the regulatory environment, weather
> conditions and other natural phenomena. Our production activities may be
> impaired by accidents associated with the operating of our crushing, concentrating
> and pelletizing plants and equipment, which could result in prolonged short-term
> downtime or longer-term shutdowns of our production facilities. These hazards
> could result in material damage to mineral properties, human exposure to
> pollution, personal injury or death, environmental and natural resource damage,
> delays in shipment, monetary losses and possible legal liability if we are unable to
> satisfy our contractual obligations under various supply contracts.

26.      In 2013, Samarco published its Management Report and Financial Statements for

the year ended December 31, 2012.   The report was prefaced with a "Message From

Management," signed by Defendant Vescovi in his capacity as the Company's CEO, stating, in

part:

> We believe we are on the right track, and our achievements exemplify this. In a
> context of volatile prices, it is important for us to be prepared to deliver what the
> market wants, meeting deadlines and guaranteeing the quality that is expected.
> For that reason, we will be paying particular attention to our production volume,
> not only in our existing plants, but also in the progress of the Fourth Pellet Plant
> Project (P4P), which by the end of 2012 had achieved 67.3% completion. The
> project, worth R$5.4 billion, is strategic for Samarco's growth and sustainability
> plans. Scheduled to become operational in January 2014, it will expand our
> production capacity by 37%. Its completion to time and on budget, *while
> protecting people's safety, respecting the environment, and sharing the benefits
> of that growth with society and the other stakeholders in our value chain*, is all
> the more important to consolidate the company's results and raise our standing in
> the market and country.
>
> Doing justice to our entrepreneurial vocation and accepting our responsibility for
> the development and transformation of the communities in which we operate, *P4P
> was devised from a perspective of shared value*, with initiatives based on
> frequent dialogue with the community, the government and industry associations,
> *together with environmental preservation and conservation actions*, some of

which are pioneering for large-scale projects, such as the carbon-offsetting of greenhouse gas (GHG) emissions throughout the implementation of P4P. (Emphases added.)

27.     On October 21, 2013, Samarco published an Offering Memorandum in connection with its offering of 5.75% notes due 2023 in an aggregate principal amount of $700 million (the "2023 Offering Memorandum").

28.     In the 2023 Offering Memorandum, with respect to safety risks in its operations, Samarco merely advised investors that:

> The exploration for, exploitation and development of, mineral deposits involves significant risks that even a combination of risk management, careful evaluation, experience and knowledge cannot eliminate. Our exploration, extraction and production activities may be hampered by industrial accidents, equipment failure, unusual or unexpected geological and geotechnical conditions, environmental hazards, labor disputes, changes in the regulatory environment, weather conditions and other natural phenomena. Our production activities may be impaired by accidents associated with the operating of our crushing, concentrating and pelletizing plants and equipment, which could result in prolonged short-term downtime or longer-term shutdowns of our production facilities. These hazards could result in material damage to mineral properties, human exposure to pollution, personal injury or death, environmental and natural resource damage, delays in shipment, monetary losses and possible legal liability if we are unable to satisfy our contractual obligations under various supply contracts.

29.     In 2014, Samarco published its Management Report and Financial Statements for the year ended December 31, 2013.   The report was prefaced with a "Message From Management," signed by Defendant Vescovi, in his capacity as Samarco's CEO, stating, in part:

> Risk management is another priority. We have developed compliance handbooks for key functions of the business, such as Environment, Marketing & Sales and Human Resources, and have also reviewed our critical risks to evaluate our ability to respond. ***Respect for life, an uncompromising value at Samarco***, was also reflected by our injury rate of 0.80 in 2013, within our goal of less than 1.00 for the year. . . .
>
> Within the P4P project, we progressed on the deliverables prescribed in our Social and Environmental Commitment (TCSA), including a waste management plan for three municipalities in the state of Espírito Santo, as well as the creation of the Southern Espírito Santo Intelligence and Imaging Center (Condesul). We also

9

invested more than R$2.4 million in environmental compensation programs and delivered environmental training to more than 35 thousand people in Germano (MG), Ubu (ES) and along the slurry pipeline route. In social communication, we held a series of meetings in municipalities within the Project's area of influence to provide information and to discuss impacts, responsibilities and Company practices.

(Emphasis added.)

30.     On September 23, 2014, Samarco published an Offering Memorandum in connection with its offering of 5.375% notes due 2024 in an aggregate principal amount of $500 million (the "2024 Offering Memorandum").

31.     In the 2024 Offering Memorandum, with respect to safety risks in its operations, Samarco merely advised investors that:

The exploration for, exploitation and development of, mineral deposits involves significant risks that even a combination of risk management, careful evaluation, experience and knowledge cannot eliminate. Our exploration, extraction and production activities may be hampered by industrial accidents, equipment failure, unusual or unexpected geological and geotechnical conditions, environmental hazards, labor disputes, changes in the regulatory environment, weather conditions and other natural phenomena. Our production activities may be impaired by accidents associated with the operating of our crushing, concentrating and pelletizing plants and equipment, which could result in prolonged short-term downtime or longer-term shutdowns of our production facilities. These hazards could result in material damage to mineral properties, human exposure to pollution, personal injury or death, environmental and natural resource damage, delays in shipment, monetary losses and possible legal liability if we are unable to satisfy our contractual obligations under various supply contracts.

32.     In 2015, Samarco published its Management Report and Financial Statements for the year ended December 31, 2014.   The report was prefaced with a "Message From Management," signed by Defendant Vescovi, in his capacity as Samarco's CEO, stating, in part:

We also believe that the gains achieved through the growth of our business must bring lasting benefits to all our stakeholders, delivering shared value. This is the mentality behind initiatives such as the Fourth Pellet Plant Project, one of the largest expansion projects in Brazil's private sector, with total investments of R$6.4 billion. The project provided an opportunity to expand our positive social and economic impact on surrounding communities in both Minas Gerais and Espírito Santo. Throughout the expansion, R$8.6 million was invested in social

and institutional programmes. We also generated approximately R$590 million in taxes and neutralised all greenhouse gas emissions during construction through compensation initiatives receiving R$1.9 million in funding.

In addition to our investments throughout the Fourth Pellet Plant Project, we continued to run our standing community, people and environmental preservation programmes with more than R$10.4 million invested in social and institutional initiatives and R$88.3 million in environmental programmes in areas such as water resources, emissions, waste and tailings. ***Investments in safety, an uncompromising priority at Samarco, totalled R$10 million toward reducing critical risks***, with particularly important progress achieved in our human/machine segregation programme.

. . .

We have also incorporated a long-term perspective into our strategic planning that takes the social and environmental dimensions of the business into account. Our Sustainability Model establishes strategic goals and indicators that address income opportunities, local development, climate change and engagement with stakeholders, all of which contribute to Samarco's long-term vision.

33.    The statements referenced in ¶¶ 23-32 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Fundão tailings dam had longstanding systemic and structural defects; (ii) despite representing to investors that Samarco had mitigated the risk of a catastrophic accident as much as possible through "a combination of risk management, careful evaluation, experience and knowledge," Samarco had in fact ignored repeated, reliable warnings regarding the condition of the Fundão tailings dam; and (iii) as a result of the foregoing, Defendants' statements about Samarco's business, operations, and prospects were false and misleading and/or lacked a reasonable basis.

**The Truth Emerges**

11

34.     On November 5, 2015, Samarco's Fundão tailings dam collapsed, causing the downstream Santarem water dam to overflow, flooding 60 million cubic meters of land, and decimating the indigenous town of Bento Rodrigues.

35.     On this news, over the next two trading days, the value of Samarco's 2022 Notes fell by $25.77, or 30.63%, to close at $58.38 on November 9, 2015; the value of Samarco's 2023 Notes fell by $35.86, or 39.74%, to close at $54.36 on November 9, 2015; and the value of Samarco's 2024 Notes fell by $30.42, or 35.18%, to close at $56.07 on November 9, 2015.

36.     Subsequent investigations revealed that Samarco had for years disregarded safety concerns raised with respect to the Fundão dam.  In 2009, Samarco hired RTI Consulting to develop an emergency action plan for its mining units, including the Company's Germano facilities and the Fundão tailings dam, but Samarco's Board of Directors refused to implement the plan, deeming it too costly and more complex than Brazilian law required.  In 2011, Pimenta de Avila, the Fundão tailings dam's designer, authored a technical report for Samarco that warned of serious problems if the dam was expanded.  In October 2013, the Instituto Pristino, a Brazilian not-for-profit organization, prepared a report (the "Pristino Report")—subsequently confirmed to have been in Samarco's possession in 2013—that warned of design deficiencies associated with the Fundão tailings dam and its planned expansion, and recommended extensive monitoring of the dam and, in light of the dam's proximity to the village of Bento Rodrigues, Samarco's submission of an emergency contingency plan.

37.     Nevertheless, Samarco disregarded these concerns and ramped up production at its Germano facilities to offset falling ore prices, thereby increasing the waste volume to be contained by the Fundão tailings dam.  However, as Brazilian prosecutors discovered, "[i]nstead of planning a new dam, with a new structure, [Samarco] looked for a patchwork solution."  In

2014, working as a consultant for Samarco, Avila identified several cracks in the dam during an inspection.  Believing that the cracks were the beginning of a rupture, Avila made several recommendations, including installation of piezometers to allow for daily monitoring of water pressure.  After the dam burst, Avila testified that he "never received any feedback or request for clarification about his reports" and that an after-the-fact review of consulting reports prepared for Samarco gave no indication that the recommended piezometers had been installed or their readings monitored.

38.     Immediately after the disaster, the government of the state of Minas Gerais suspended Samarco's activities.  Within weeks, the United Nations reported that multiple independent scientific tests, commissioned by Brazilian authorities after the collapse, found dangerous levels of toxic heavy metals in the Rio Doce River.

39.     On November 30, 2015, the Brazilian government announced its intent to commence legal proceedings against Samarco, along with BHP and Vale, to force the companies to establish a $5.2 billion environmental recovery and compensation fund.  That same day, Brazilian President Dilma Rousseff blamed the disaster on the "irresponsible action of a company," adding: "We are severely punishing those responsible for this tragedy."

40.     On this news, the value of Samarco's 2022 Notes fell by $10.13, or 21.6%, to close at $36.79 on November 30, 2015; the value of Samarco's 2023 Notes fell by $11.58, or 24.57%, to close at $35.55 on November 30, 2015; and the value of Samarco's 2024 Notes fell by $10.58, or 22.54%, to close at $36.34 on November 30, 2015.

41.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's Notes, Plaintiff and other Class members have suffered significant losses and damages.

**Post-Class Period Disclosures**

42.     In February 2016, Defendant Vescovi and Samarco's Director of Operations, Kleber Luiz de Mendonca Terra, were charged with "qualified homicide," which in Brazil is murder aggravated by certain factors, such as a vile motive, for their roles in the dam collapse. In May 2016, the Brazilian Federal Public Prosecution Service commenced legal proceedings against Samarco, BHP, and Vale, seeking to recover $43 billion in compensation relating to the Fundão dam collapse.   In June 2016, Brazil's federal police formally accused Samarco of deliberate misconduct in relation to the collapse after concluding that the Company had for years ignored clear warnings signs that the Fundão dam was at risk of collapsing.

43.     In October 2016, the Public Prosecutor's Office of Brazil filed charges against Samarco, Vale, and BHP Billiton, as well as 26 people—21 of whom were charged with qualified homicide—for their roles in the collapse of the Fundão tailings dam, asserting that the companies and individuals knew the dam could fail but prioritized profits over safety.

44.     As a result of the catastrophic failure of the Fundão tailings dam and the consequences thereof, Samarco's mining operations were suspended and have not been resumed since the collapse.

**PLAINTIFFS' CLASS ACTION ALLEGATIONS**

45.     Plaintiff bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Samarco's Notes during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are the Defendants herein, the officers and directors of the Company, at all relevant times, members of

their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

46.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by the transfer agent of Samarco's offerings of the Notes and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

47.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

48.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

49.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Samarco;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Samarco's Notes during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

50.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

51.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Samarco's Notes are traded in an efficient market;

- the Company's Notes were liquid and traded with moderate to heavy volume during the Class Period;

- the Company's Notes were traded by multiple U.S. broker-dealers and/or counterparties and were covered by multiple rating agencies;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased or otherwise acquiredSamarco's Notes between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

52.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

53.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I
### (Against All Defendants For Violations of
### Section 10(b) And Rule 10b-5 Promulgated Thereunder)

54.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

55.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

56.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which it knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Samarco's Notes; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Samarco's Notes and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants took the actions set forth herein.

57.     Pursuant to the above plan, scheme, conspiracy and course of conduct, the Defendants participated directly or indirectly in the preparation and/or issuance of the statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Samarco's Notes.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Samarco's finances and business prospects.

58.      Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, Defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

59.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Samarco, Defendant Vescovi had knowledge of the details of Samarco's internal affairs.

60.     Defendant Vescovi is liable both directly and indirectly for the wrongs complained of herein.  Because of his position of control and authority, Defendant Vescovi was able to and did, directly or indirectly, control the content of the statements of Samarco.  As a result of the dissemination of the aforementioned false and misleading reports, releases and

public statements, the market price of Samarco's Notes was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Samarco's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Samarco's Notes at artificially inflated prices and relied upon the price of the Notes, the integrity of the market for the Notes and/or upon statements disseminated by Defendants, and were damaged thereby.

61.     During the Class Period, Samarco's Notes were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired Samarco's Notes at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Samarco's Notes was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Samarco's Notes declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

62.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

63.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases

and/or acquisitions of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

<u>COUNT II</u>
**(Violations of Section 20(a) of the
<u>Exchange Act Against Defendant Vescovi)</u>**

64.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

65.    During the Class Period, Defendant Vescovi participated in the operation and management of Samarco, and conducted and participated, directly and indirectly, in the conduct of Samarco's business affairs.  Because of his senior position, Defendant Vescovi knew the adverse non-public information regarding the condition of Samarco's Fundão dam and the likelihood of a catastrophic incident.

66.    Defendant Vescovi, as CEO of Samarco, had a duty to disseminate accurate and truthful information with respect to the operational risks associated with the Fundão tailings dam, and to correct promptly any public statements issued by Samarco which had become materially false or misleading.

67.    Because of his position of control and authority as a senior officer, Defendant Vescovi was able to, and did, control the contents of the statements and documents described above concerning Samarco's operations.  Throughout the Class Period, Defendant Vescovi exercised his power and authority to cause Samarco to engage in the wrongful acts complained of herein. Defendant Vescovi therefore was a "controlling person" of Samarco within the meaning of Section 20(a) of the Exchange Act.  In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of Samarco's Notes.

68.     By reason of the above conduct, Defendant Vescovi is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Samarco.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

### DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  November 14, 2016

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
       ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181

21

Facsimile:   (312) 377-1184
Email:  pdahlstrom@pomlaw.com


***Attorneys for Plaintiff***

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.　　I, Enrica Morpurgo, on behalf of Banco Safra S.A. – Cayman Islands Branch ("Banco Safra"), make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.　　I have reviewed a Complaint against Samarco Mineração S.A. ("Samarco" or the "Company") and Ricardo Vescovi de Aragão ("Vescovi", and together with Samarco, the "Defendants") and authorize the filing of a motion on behalf of Banco Safra for appointment as lead plaintiff.

3.　　Banco Safra did not purchase or acquire Samarco securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.　　Banco Safra is willing to serve as a representative party on behalf of a Class of investors who purchased or acquired Samarco securities during the Class Period as specified in the Complaint, including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.　　To the best of my current knowledge, the attached sheet lists all of Banco Safra's transactions in Samarco securities during the Class Period.

6.　　During the three-year period preceding the date on which this Certification is signed, Banco Safra has not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.　　Banco Safra agrees not to accept any payment for serving as a representative party on

behalf of the class as set forth in the Complaint, beyond its pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.      I declare under penalty of perjury that the foregoing is true and correct.

**Executed November 11, 2016**

*Enrica Morpurgo*

**Enrica** Morpurgo
**Head Counsel**

**SAMARCO MINERACAO S.A.**                                      **Banco Safra S.A.**

### LIST OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|------|------------------|-------------------|-----------------|

**Samarco Mineracao 4 1/8 2022**
**ISIN: USP84050AA46**

| DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|------|------------------|-------------------|-----------------|
| 07/22/2013 | Purchase | 3,100,000 | 90.3000 |
| 07/25/2013 | Purchase | 5,000,000 | 89.1000 |
| 07/26/2013 | Purchase | 5,000,000 | 89.1000 |
| 12/16/2013 | Sale | 7,000,000 | 90.1800 |
| 01/06/2014 | Sale | 5,000,000 | 89.8400 |
| 04/23/2014 | Sale | 1,100,000 | 92.7700 |
| 02/09/2015 | Purchase | 2,000,000 | 90.7500 |
| 04/16/2015 | Purchase | 11,000,000 | 91.9200 |
| 04/17/2015 | Purchase | 5,000,000 | 91.8500 |
| 04/20/2015 | Purchase | 2,000,000 | 91.6250 |
| 04/22/2015 | Purchase | 569,000 | 91.8000 |
| 11/16/2015 | Sale | 1,000,000 | 59.7500 |
| 11/16/2015 | Sale | 1,000,000 | 60.8000 |
| 11/16/2015 | Sale | 1,000,000 | 61.0000 |

Samarco Mineracao 5 3/4 2023
**ISIN: USP84050AB29**

| DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|------|------------------|-------------------|-----------------|
| 03/25/2015 | Purchase | 500,000 | 97.0900 |
| 03/25/2015 | Purchase | 3,000,000 | 96.9500 |
| 03/26/2015 | Purchase | 2,000,000 | 96.7200 |
| 03/26/2015 | Purchase | 1,930,000 | 96.7200 |
| 04/13/2015 | Purchase | 1,000,000 | 99.6500 |
| 04/15/2015 | Purchase | 500,000 | 99.5750 |
| 04/22/2015 | Purchase | 5,000,000 | 99.3000 |
| 04/22/2015 | Purchase | 5,000,000 | 99.3000 |
| 04/23/2015 | Purchase | 5,000,000 | 99.7500 |
| 04/29/2015 | Purchase | 5,778,000 | 99.9500 |
| 04/29/2015 | Purchase | 1,000,000 | 100.0000 |
| 05/20/2015 | Purchase | 300,000 | 100.7500 |
| 05/26/2015 | Purchase | 2,000,000 | 101.5500 |
| 05/28/2015 | Purchase | 2,300,000 | 101.2500 |
| 05/29/2015 | Purchase | 1,000,000 | 100.7500 |
| 09/08/2015 | Sale | 4,000,000 | 91.6500 |
| 09/08/2015 | Sale | 2,000,000 | 91.7000 |

Samarco Mineracao 5 3/8 2024
**ISIN: USP84050AC02**

| DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|------|------------------|-------------------|-----------------|
| 09/23/2014 | Purchase | 35,000,000 | 99.7320 |
| 09/24/2014 | Purchase | 3,000,000 | 99.8000 |
| 09/25/2014 | Purchase | 5,000,000 | 99.6000 |

**SAMARCO MINERACAO S.A.**                                    **Banco Safra S.A.**

## LIST OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|------|------------------|-------------------|-----------------|
| 09/26/2014 | Purchase | 3,000,000 | 98.8000 |
| 09/29/2014 | Purchase | 2,000,000 | 98.4000 |
| 10/14/2014 | Purchase | 3,000,000 | 99.6000 |
| 10/15/2014 | Purchase | 2,000,000 | 99.6000 |
| 10/16/2014 | Purchase | 5,000,000 | 99.4500 |
| 04/20/2015 | Purchase | 600,000 | 95.0000 |
| 04/29/2015 | Purchase | 2,525,000 | 95.9500 |
| 04/29/2015 | Purchase | 4,000,000 | 95.9000 |
| 09/01/2015 | Sale | 310,000 | 90.1500 |
| 09/01/2015 | Sale | 250,000 | 90.0000 |
| 09/02/2015 | Sale | 500,000 | 89.4000 |
| 09/02/2015 | Sale | 500,000 | 89.4000 |
| 09/09/2015 | Sale | 1,000,000 | 88.2000 |
| 10/27/2015 | Sale | 1,000,000 | 86.7500 |
| 10/28/2015 | Sale | 1,000,000 | 86.5000 |
| 10/30/2015 | Sale | 1,000,000 | 86.2500 |
| 11/03/2015 | Sale | 500,000 | 86.6250 |
| 11/04/2015 | Sale | 500,000 | 87.0000 |