UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BANCO SAFRA S.A. – CAYMAN
ISLANDS BRANCH, Individually and on
Behalf of All Others Similarly Situated,

       Plaintiff,

- against -

SAMARCO MINERAÇÃO S.A., BHP
BILLITON LIMITED, BHP BILLITON
PLC, BHP BILLITON BRASIL LTDA., and
VALE S.A.,

       Defendants.

---

16 Civ. 8800 (RMB)

**DECISION & ORDER**

## I. Background

This Decision & Order resolves the motion of Samarco Mineração S.A. ("Samarco"); BHP Billiton Limited ("BHP Ltd"), BHP Billiton PLC ("BHP Plc"), BHP Billiton Brasil LTDA ("BHP Brasil") (BHP defendants collectively, "BHP"); and Vale S.A. ("Vale") (collectively, "Defendants"), to dismiss Plaintiff's third filed complaint ("Third Complaint"), dated March 21, 2018. The Third Complaint – as were Plaintiff's first and second complaints – was filed as a class action by Banco Safra S.A. – Cayman Islands Branch ("Plaintiff" or "Banco Safra"). Second Amended Complaint, dated Mar. 21, 2018 ("Third Complaint" or "3rd Complaint").

Plaintiff is an offshore branch of Banco Safra S.A., a Brazilian bank, and was established under the laws of the Cayman Islands. Memorandum in Support of Motion, dated Jan. 13, 2017, at 8. Samarco is a Brazilian mining company that owns and operates iron ore mines and pellet processing facilities in the Brazilian states of Minas Gerais and Espirito Santo. Third Complaint

1

155. Samarco is a private company that is co-owned by BHP Brasil and Vale, all three of which are headquartered in Brazil. Id. ¶¶ 32, 34, 36, 58.

Banco Safra purports to bring this action "on behalf of all purchasers of debt securities issued by Samarco ['Samarco Bonds'] during the Class Period [October 31, 2012 to November 30, 2015], who purchased such securities in domestic U.S. transactions." Id. ¶ 1. The Samarco Bonds purchased by Banco Safra were initially offered "only outside the United States" and Banco Safra "acquired the overwhelming majority of [bonds] in the secondary market." Pl.'s Opp'n to Defs.' Mot. to Dismiss, dated Aug. 1, 2017 ("Pl.'s First Opp'n"), at 7 n.4.[1]

Banco Safra alleges that Defendants violated U.S. federal securities laws, particularly Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), Rule 10b-5 promulgated thereunder, and Section 20(a) of the Exchange Act, id. § 78t(a) ("Section 20(a)"). Third Complaint ¶¶ 1, 22. It also brings state claims against Defendants for common law fraud, aiding and abetting fraud, and negligent misrepresentations under New York State law. Id. ¶ 2.

Banco Safra alleges that "[t]his class action arises out of what is widely regarded as the worst environmental disaster in Brazil's history," which occurred on November 5, 2015 when Samarco's Fundao "tailings" dam burst, "releasing more than 16,000 Olympic swimming pools' worth of wastewater ... generated by Samarco's mining operations in ... Minas Gerais." Id. 3. Banco Safra claims that during the Class Period, Defendants misled investors "about the safety of the Samarco's mining operations, including the Fundao dam and the tailings deposited at the dam, Samarco's iron ore production and related matters." Id. 15.

---

[1] On January 20, 2017, the Court appointed Banco Safra as lead plaintiff and Pomerantz LLP as lead counsel. See Order, dated Jan. 20, 2017.

In sum, this is a case by a Brazilian/Cayman Island plaintiff against Brazilian defendants regarding Brazilian bonds and claims which relate to a Brazilian catastrophe. The bonds were never listed on a U.S. exchange and were principally offered and sold outside the United States. It is difficult to perceive a domestic transaction under Morrison and its Second Circuit progeny.

**Plaintiff's First Two Complaints**

The instant complaint is Plaintiff's third attempt sufficiently to plead a domestic U.S. transaction. Banca Safra filed its first complaint on November 14, 2016. See First Complaint, dated Nov. 14, 2016. On March 6, 2017, Banco Safra on its own initiative filed its second complaint which amended its First Complaint by adding "Exhibit A." See Second Complaint, dated Mar. 6, 2017. Exhibit A purports to "bolster" the Plaintiff's pleading of a domestic transaction by listing purchases and sales of Samarco Bonds, and including for each listed transaction the name and address of the U.S. "Counterparty/Broker-dealer," the trade date, and the purchase or sale price in U.S. dollars. Id. at 2-3. The Second Complaint states that "[a]s set forth in Exhibit A attached hereto, Lead Plaintiff purchased Samarco bonds in domestic (U.S.) transactions during the Class Period and was damaged thereby. Specifically, Lead Plaintiff purchased Samarco bonds from counterparties and/or broker dealers located in the United States." Second Complaint ¶ 25.[2]

---

[2] The Second Complaint also added the BHP defendants and individual executives of both BHP and Vale. On April 4, 2017, Plaintiff voluntarily dismissed all of the individual defendants, including Ricardo Vescovi De Aragao, Kleber Luiz De Mendonca Terra, Maury Souza Junior, Jose Carlos Martins, Stephen Michael Potter, James John Wilson, Jeffery Mark Zweig, Helio Cabral Moreira, Sergio Consoli Fernandes, Pedro Jose Rodrigues, and Margaret Beck, all of whom are officers of Defendant companies. See Notice of Voluntary Dismissal Without Prejudice, dated Apr. 4, 2017. The Court approved the dismissal of these (individual) defendants on April 5, 2017. Order, dated Apr. 5, 2017.

3

On June 26, 2017, Defendants filed a motion to dismiss the Second Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure arguing, principally, that "Plaintiff has not [adequately] alleged a [U.S.] domestic securities transaction, and thus its federal securities claims must be dismissed" under Morrison v. Nat'l Australia Bank, 561 U.S. 247 (2010). Defs.' Memorandum in Supp. of Mot. to Dismiss, dated June 26, 2017, at 4. Defendants (persuasively) argued that: "Merely alleging that [a] transaction[] took place in the United States or that a U.S. broker-dealer was involved is insufficient. . . . Plaintiff makes no attempt to allege where its contracts were formed, where its purchase orders were placed, where title to the Notes passed, or where payment was exchanged." Id. (internal quotations omitted).

On August 1, 2017, Banco Safra filed its opposition to Defendants' motion. It separately filed a declaration, dated August 1, 2017, from its General Counsel Enrica Morpurgo apparently to bolster its claim that the case involves U.S. domestic transaction(s). See Pl.'s First Opp'n; Decl. of Enrica Morpurgo, dated Aug. 1, 2017 ("Morpurgo Declaration"). Banco Safra contended that "the [Second] Complaint plausibly alleges domestic transactions by pleading that Plaintiff purchased Samarco bonds in domestic (U.S.) transactions during the Class Period, specifically pleading that Plaintiff purchased Samarco bonds from counterparties and/or broker dealers located in the United States." Pl.'s First Opp'n at 7. Plaintiff also contended that "[a]lthough unnecessary, Plaintiff provides additional evidence of domesticity. As set forth in the Declaration of Enrica Morpurgo submitted in support of Plaintiff's opposition, all of the transactions listed in Exhibit A were conducted by Safra and/or its affiliates through bank accounts located in New York. Moreover, as reflected in Exhibit A, all of the counterparties to the transactions and/or their agents were located in the United States." Pl.'s First Opp'n at 9. The

4

Morpurgo Declaration also states that the alleged securities transactions "were consummated with U.S. dollars." Morpurgo Decl. ¶¶ 2-3.

On August 31, 2017, Defendants filed a reply arguing that "The Declaration from Plaintiff's General Counsel [] would not cure any deficiencies in the allegations even if the Court could consider the Declaration, which plainly it cannot. In neither the Complaint nor the Declaration does Plaintiff allege any of the facts required to plead a U.S. securities transaction: facts concerning the formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money." Defs.' Rep. Mem. of Law in Supp. of Their Mot. to Dismiss, dated Aug. 31, 2017 (internal quotations omitted).

On March 7, 2018, the Court denied without prejudice Defendants' motion to dismiss and directed Plaintiff to **submit a final amended complaint** by March 21, 2019. Order, dated Mar. 7, 2018, at 1. Plaintiff filed its Third Complaint on March 21, 2018. With respect to Defendants' challenge over domesticity, Plaintiff included in the Third Complaint the allegations which had been set forth in the Morpurgo Declaration. See Third Complaint ¶¶ 25-27.

On May 21, 2018, Defendants jointly moved to dismiss the Third Complaint, arguing that Plaintiff's various changes (additions) to their earlier complaints still fail to satisfy the domestic transaction criteria of Morrison. Defendants' Motion to Dismiss the Second Amended Complaint, dated May 21, 2018 ("Def. Mot."), at 1. They argue that Plaintiff's allegations "do not speak to whether irrevocable liability was incurred or title passed in [the United States]," and they fail to "allege where contracts were formed, title passed, or money was exchanged. . . .

5

Plaintiff does not allege any U.S. conduct by anyone relevant to its claims, making its claims overwhelmingly foreign and thus outside the scope of the federal securities laws." Id. at 5-6.[3]

On June 18, 2018, Plaintiff filed its opposition, contending that the Third Complaint "support[s] a plausible – if not compelling – inference of domesticity" because (i) "all of the counterparties to the transactions and/or their agents were located in the United States;" (ii) "all of the transactions listed in Exhibit A to the Complaint [] were conducted by Banco Safra and/or its affiliates through Banco Safra's bank accounts located in New York;" (iii) "all transactions were consummated in U.S. dollars;" and (iv) "each after-market transaction . . . was reported to TRACE, the automated system developed by the Financial Industry Regulatory Authority ["FINRA"]." Opp'n at 6.

On July 3, 2018, Defendants submitted their reply memorandum stating that "Plaintiff's Opposition confirms it cannot allege that it purchased any Samarco Notes in a domestic transaction. . . . The Second Circuit has held [Plaintiff's] very allegations insufficient: the location of the broker does not show where a contract was made []; the involvement of U.S. bank accounts and U.S. dollars does not show a U.S. purchase;" and "Plaintiff offers no authority showing that only domestic transactions under *Morrison* are reported to TRACE." Reply Memorandum, dated July 3, 2018 ("Reply"), at 1, 3-4.

Helpful oral argument was held on October 5, 2018.

**For the reasons set forth below, Defendants' motion to dismiss [#60] is granted.[4]**

---

[3] Defendants also argue that the Third Complaint should be dismissed based upon Plaintiff's failure to plead the elements of federal securities fraud under Sections 10(b) and 20(a), see Def. Mot. at 1-2, and that each of Plaintiff's claims under New York State law should be dismissed. Id. at 30-32.

[4] **Any arguments raised by the parties but not specifically addressed herein have been considered by the Court on the merits and rejected.**

6

## III. Legal Standard

"Based on th[e] presumption against extraterritoriality, the Supreme Court held in Morrison [v. Nat'l Australia Bank, 561 U.S. 247 (2010)] that the reach of U.S. securities law is presumptively limited to (1) 'transactions in securities listed on domestic exchanges,' and (2) 'domestic transactions in other securities.'" In re Petrobras Sec., 862 F.3d at 262 (2d Cir. 2017) (quoting Morrison, 561 U.S. at 267). "[T]o sufficiently allege the existence of a domestic transaction in other securities, plaintiffs must allege facts indicating that irrevocable liability was incurred or that title was transferred within the United States." Absolute Activist Value Master Fund Ltd. v. Ficeto, 677 F.3d 68 (2d Cir. 2012).

"[I]t is a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the United States. But the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case." Morrison, 561 U.S. at 266 (emphasis in original).

In Morrison, "the Supreme Court dismissed the notion that the extraterritoriality of § 10(b) [of the Exchange Act] raises an issue of subject matter jurisdiction. . . . *Morrison* makes clear that whether § 10(b) applies to certain conduct is a 'merits' question." Absolute Activist, 677 F.3d at 66-67.

"Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. If the federal law claims are dismissed before trial, the state claims should be dismissed as well." Kolari v. New York-Presbyterian Hosp., 455 F.3d 118, 122 (2d Cir. 2006) (quoting United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966) (internal quotation marks, ellipses, and brackets omitted).

7

Leave to amend "should generally be denied in instances of futility, undue delay, bad faith or dilatory motive, [or] repeated failure to cure deficiencies by amendments previously allowed . . . ." United States ex rel. Ladas v. Exelis, Inc., 824 F.3d 16, 28 (2d Cir. 2016).

## III. Analysis

### Plaintiff Fails to Allege a Domestic U.S. Securities Transaction

Defendants show that Plaintiff's allegations – even as supplemented by Exhibit A, the Morpurgo Declaration, and three complaints and as informed by arguments and authorities presented in two motions to dismiss – are insufficient to plead a domestic transaction under Morrison. That is, Plaintiff's allegations do "not speak to whether irrevocable liability was incurred or title passed in [the United States]." Def. Mot. at 5. "The[ir] allegations say nothing about where contracts were formed, orders placed or received, title passed or from where payment was made or where it was received." Reply at 2-3; see, e.g., Absolute Activist, 677 F.3d at 66-69; In re Petrobras Sec., 862 F.3d at 262.

Banco Safra acknowledges that it must sufficiently allege a U.S. "domestic transaction" because, among other things, it is undisputed that the Samarco Bonds were never listed on a U.S. exchange (and, relatedly, were initially offered outside the United States). See Opp'n at 5-9; see also Pl.'s First Opp'n at 7 n.4. Plaintiff contends that the Third Complaint pleads four allegations which "collectively, support a plausible—if not compelling inference of domesticity." Opp'n at 6-7 (internal quotation marks omitted).

In Absolute Activist, the Second Circuit explained that a transaction is considered domestic if either "(1) the purchaser [] incurred irrevocable liability within the United States to take and pay for a security, or the seller incurred irrevocable liability within the United States to deliver a security, or (2) legal title to the security must have transferred in the United States." In

8

re Petrobras, 862 F.3d at 262 (quoting Absolute Activist, 677 F.3d at 68) (internal quotations removed). The plaintiffs in Absolute Activist were nine Cayman Islands-based hedge funds which bought shares of "penny stock" companies incorporated in the United States in private "over-the-counter" transactions. Id., 677 F.3d at 62-63. The plaintiffs alleged that their transactions were carried out "through" Hunter, which was an "SEC-registered broker-dealer incorporated and based in California"; that the hedge funds' investors "wir[ed] money to a bank located in New York"; and that the hedge funds "were heavily marketed in the United States." Id. at 68-69. The Second Circuit (in affirming the District Court) found that the plaintiffs failed to state claims under § 10(b) because the plaintiffs' complaint lacked allegations "suggesting that the Funds became irrevocably bound within the United States or that title was transferred within the United States, including, but not limited to, facts concerning the formation of [] contracts, the placement of purchase orders, the passing of title, or the exchange of money." Id. at 70.

Banco Safra's (four) principal allegations of domesticity are, similarly, insufficient to show that irrevocable liability was incurred within the United States or that title transferred to the Bonds in the United States. For one thing, the fact that Banco Safra's "counterparties and/or brokers" were located in the United States does not establish that Banco Safra's purchases and sales of Samarco Bonds were domestic transactions. See id. at 69. The Second Circuit has determined that "[t]he location or residency of the buyer, seller, or broker will not necessarily establish the situs of [a] transaction." See In re Petrobras Sec., 862 F.3d at 262. The only information which Banco Safra provides with respect to its counterparties and/or brokers are their names and addresses. While the Absolute Activist court recognized that the role of U.S. broker-dealers, where properly alleged, may sometimes demonstrate domesticity, it also found that plaintiffs' allegations in that case were insufficient. Id., 677 F.3d at 70 ("[A]bsent more

9

detailed factual allegations about Hunter's role in the transactions, [plaintiffs'] allegation is []
insufficient to demonstrate that the transactions occurred in the United States."). As was true of
the plaintiffs in Absolute Activist, Banco Safra fails to explain how their counterparties' and/or
broker dealers' names and addresses are "facts related to the formation of contracts, the
placement of purchase orders, the passing of title, or the exchange of money." See id. Banco
Safra's allegations about its counterparties and/or brokers lack the kind of detailed facts found by
other courts to be necessary in order to plead a U.S. domestic transaction. See, e.g., United States
v. Vilar, 729 F.3d 62, 77 (2d Cir. 2013) (where the Government alleged that a victim of an
alleged securities fraud scheme entered into and renewed her agreement in New York, and
"executed the documents" necessary to invest in the security in her New York apartment and
handed those documents to a New York messenger) (internal quotations omitted); United States
v. Georgiou, 777 F.3d 125, 136 (3d Cir. 2015) (where the Government alleged the "involvement
of a purchaser or seller working with a market maker and committing to a transaction in the
United States, [and] . . . specific instances in which the [securities] were bought or sold at
[defendant's] direction from entities located in the United States"); Atlantica Holdings, Inc. v.
Sovereign Wealth Fund Samruk-Kazyna JSC, 2 F. Supp. 3d 550, 560 (S.D.N.Y. 2014) (where
plaintiffs alleged that they purchased securities by "placing an order with a broker in [] Miami,
Florida" who "then transmitted the order to its broker-dealer in New York, New York, where
funds from Plaintiff's account maintained with [the broker] were transferred internally to [the
broker's] back office, where the order was filled and the transaction was completed") (brackets,
ellipses, and internal quotations omitted); Butler v. United States, 992 F. Supp. 2d 165, 178
(E.D.N.Y. 2014) (where the plaintiff alleged that he "bought and sold securities from [a bank's]
office in New York," and "trading was conducted between [the plaintiff], the liaison desk at [the

bank's] New York office, and other United States Banks," and where plaintiff "made these purchases and sales on behalf of his clients, pursuant to instructions made to him in New York over the phone or through email"); see also Quail Cruises Ship Mgmt. Ltd. v. Agencia de Viagens CVC Tur Limitada, 645 F.3d 1307, 1310 (11th Cir. 2011) (where plaintiffs alleged that "the transaction for the acquisition of [securities] closed in Miami, Florida").

Second, Banco Safra's allegation that all of the transactions listed in Exhibit A were conducted by Banco Safra and/or its affiliates "through" Banco Safra's bank accounts located in New York, is not sufficient to plead domestic transactions, i.e., that irrevocable liability was incurred or title passed in the U.S. Similar allegations were rejected by the Second Circuit in United States v. Vilar, where although the court ultimately found that the Government sufficiently pleaded a domestic transaction, it also stated that the Government's allegations that investors were directed to wire funds to a New York bank, and the custodian of the defendants' fund was a New York securities firm, were "insufficient to demonstrate a purchase or sale of a security in the United States." 729 F.3d at 77 n.10. Similarly, Plaintiff's allegations that its purchases and sales of Samarco Bonds were conducted "through" bank accounts in New York are insufficient to demonstrate a domestic transaction. See MVP Asset Mgmt. (USA) LLC v. Vestbirk, 2012 WL 2873371, at *7 (E.D. Cal. July 12, 2012) (where plaintiff's allegation that "certain funds were transferred in between New York-based banking institutions, [were] insufficient to establish the existence of a domestic transaction, as required under Section 10(b)"); Cascade Fund, LLP v. Absolute Capital Mgmt. Holdings Ltd., 2011 WL 1211511, at *7 (D. Colo. Mar. 31, 2011) (where "the funds to complete [a] transaction were wired (at least initially) to New York" did "not amount to a conclusion that the transaction was completed in New York" and was "insufficient to deem the locus of the transaction to be the United States").

11

Defendants persuasively contend that what the Third Complaint states is only that "the transactions were conducted through Banco Safra's bank accounts located in New York, . . . not from an account purchased by Banco Safra in New York to a U.S. New York based broker-dealer, it's through. . . . [I]f that's enough, then there is almost no limiting principle. New York is the financial capital of the world. . . . [M]any wire transfers and other financial transactions pass through our banking system here. That [does not] . . . show the passage of title." See Oral Argument Transcript, dated Oct. 5, 2018, at 7-8 (emphasis in original).

Third, Banco Safra's allegation that the transactions listed in Exhibit A were "consummated with U.S. dollars" is also insufficient to plead a U.S. domestic transaction. The currency used in a particular transaction does not "necessarily ha[ve] any bearing on whether a purchase or sale is domestic within the meaning of *Morrison*." See Absolute Activist, 677 F.3d at 69. Whether U.S. dollars were used to buy or sell Samarco Bonds does not assist the Court in determining the "locus" of a securities purchase or sale, i.e., "the time when the parties to the transaction are committed to one another ... in the classic contractual sense, [where] there was a meeting of the minds of the parties." See Arco Capital Corps. Ltd. v. Deutsche Bank AG, 949 F. Supp. 2d 532, 542 (S.D.N.Y. 2013) (quoting Absolute Activist, 677 F.3d at 67-68). And, as Defendants correctly argue, "the [Samarco Bonds] were dollar-denominated, so *any* transaction in them was in U.S. dollars; and, of course, U.S. dollars can be used anywhere. Th[at] allegation[] [] do[es] not show a U.S. transaction." See Def. Mot. at 4 (emphasis in original).

Fourth, Plaintiff unpersuasively argues that its transactions in Samarco Bonds were domestic because each transaction listed in Exhibit A was "reported to TRACE," and that "U.S. transactions are required to be reported to TRACE." See Opp'n at 6-7. TRACE is a "tracking system" that facilitates the mandatory reporting of over-the-counter secondary market

12

transactions, including debt securities purchased or sold as part of a U.S. transaction. See Opp'n at 6-7 (quoting www.finra.org/sites/default/files/NoticeDocument/p314034.pdf). Plaintiff's reliance upon TRACE is misplaced. For one thing, merely reporting a transaction to TRACE does not establish that the transaction is domestic, i.e., "whether the purchase or sale [wa]s made in the United States." Morrison, 561 U.S. at 269–70. TRACE reporting does not determine whether or where irrevocable liability was incurred or where title transferred. See Absolute Activist, 677 F.3d at 67. The Court has found no case – and Plaintiff has not cited any – which holds that reporting to TRACE is sufficient to allege that irrevocable liability was incurred or title transferred in the United States. As Defendants correctly point out, "nothing in the TRACE regulations states that non-U.S. transactions cannot be reported," see Def. Mot. at 5, or that Banco Safra was precluded from reporting its purchases and sales of Samarco Bonds to TRACE even if they were not domestic transactions.

### The Complaint is Dismissed With Prejudice

Defendants argue persuasively that Plaintiff's Federal claims should all be dismissed with prejudice because Plaintiff's "third attempt to plead federal securities [] claims . . . does not cure the numerous deficiencies in Plaintiff's prior filings. [T]he . . . changes in the [Third Complaint] are a [failed] effort to plead a domestic securities transaction." Def. Mot. at 2, 32. Plaintiff contends that "[i]f the Court dismisses all or any portion of the Complaint, Plaintiff respectfully requests that it be given leave to amend in accordance with Federal Rule of Civil Procedure 15(a)." Opp'n at 32 n.45.

Federal Rule of Civil Procedure 15(a) states that a "party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. Rule of Civ. Proc. 15(a)(2). The cases construing Rule 15(a) indicate that "[l]eave to amend . . . should generally be denied in

13

instances of futility, undue delay, bad faith or dilatory motive, [or] repeated failure to cure deficiencies by amendments previously allowed . . . ." United States ex rel. Ladas v. Exelis, Inc., 824 F.3d 16, 28 (2d Cir. 2016).

Plaintiff's "repeated failures to cure" preclude further amendment here. See Foman v. Davis, 371 U.S. 178, 182 (1962). Notwithstanding two prior amendments, the addition of Exhibit A and the Morpurgo Declaration, Plaintiff has failed to cure the Morrison deficiencies in its Third Complaint. See, e.g., Fadem v. Ford Motor Co., 157 F. App'x 398, 399 (2d Cir. 2005) (where plaintiffs "had failed to cure the deficiencies of their original complaint"); Cinema Vill. Cinemart, Inc. v. Regal Entm't Grp., 708 F. App'x 29, 32 (2d Cir. 2017) ("We need not address whether the district court improperly dismissed [plaintiff's] claim with prejudice because it has not shown how further amendments to its complaint could cure [its] deficiencies . . . ."); Brown v. Coach Stores, Inc., 163 F.3d 706, 712 (2d Cir. 1998) (where plaintiff had been given the "opportunity to file an amended complaint designed to cure the very defect that remains"). Plaintiff has had two opportunities to amend its First Complaint. And, Plaintiff was on notice from the Court that its Third Complaint was its last opportunity sufficiently to allege a domestic transaction. See Order, dated Mar. 7, 2018 ("Plaintiff shall have until Wednesday, March 21, 2018 (noon) to submit a **final amended complaint**.") (emphasis added).

## IV. Conclusion & Order

For the reasons stated above, the Defendants' motion to dismiss [#84] is granted with prejudice. Plaintiff's state claims are dismissed without prejudice to their being filed in state court.[5]

Dated: June 18, 2019
New York, New York

*RMB* (signature)

**RICHARD M. BERMAN**
**U.S.D.J**

---

[5] Because the Court is dismissing Plaintiff's federal claims, it also dismisses Plaintiff's claims under New York State law but does so without ruling upon the merits of the state court allegations. See Kolari, 455 F.3d at 122 ("If the federal law claims are dismissed before trial[,] the state claims should be dismissed as well.").